SOUTH PORTO RICO SUGAR COMPANY ET AL., Petitioners, *v.* SUPPLIES APPEAL COURT, Respondent.

No. 1793. Argued November 7, 1949.—Decided December 1, 1949.

598

*James R. Beverley* and *R. Castro Fernández* for petitioners. *Vicente Géigel Polanco, Attorney General* (*José Trías Monge,* *Acting Attorney General,* on the brief) and *Francisco Torres Aguiar, Assistant Attorney General,* for intervener.

MR. JUSTICE SNYDER delivered the opinion of the Court.

Does the General Supplies Administrator have the power under Act No. 228, Laws of Puerto Rico, 1942, to establish maximum sales prices for staple commodities only when such prices have risen or threaten to rise? Or, as the Administrator contends, does he have such power even if prices have not risen or threatened to rise, provided the Administrator finds that fixing such prices will effectuate the purposes of Act No. 228 as set forth in § 1, including elimination of excessive profits?

On May 17, 1948 the Administrator entered Administrative Order No. 175 amending Order No. 174 of May 13, 1948 fixing in various classifications the maximum sales prices of refined sugar in Puerto Rico. The order recited that it was issued by virtue of the powers vested in the Administrator

under § 3 (a) (c) (e) of Act No. 228. Pursuant to § 11, all the entities which refine sugar in Puerto Rico filed a petition for reconsideration, which was denied. Thereafter, the refineries filed a complaint in the Supplies Appeal Court under § 12 (a) for reversal of the order. That court entered a judgment dismissing the complaint. Pursuant to § 12 (d), we issued a writ of certiorari on petition of the refineries to review the decision of the Supplies Appeal Court.[1]

 The first assignment of error is that pursuant to § 3 (a) the Administrator has the power to fix maximum prices of a commodity only when the price thereof has risen

---

[1] This case requires us to examine certain provisions of Act No. 228. Section 1: "The purposes of this Act are hereby declared to be the stabilization of prices, the prevention of speculative, unwarranted, and abnormal increases in prices; the elimination and prevention of excessive profits; hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions and scarcity caused by the national emergency; the assurance that defense appropriations will not be dissipated by excesssive prices; the protection and maintenance of the standard of living of persons whose incomes are limited; the prevention of such economic dislocations, as will result from abnormal increases in prices; the securing of adequate production of staple products; the prevention of a post-war collapse of values; the purchase, obtention, storing, disposal, and regulation of staple commodities for the benefit of the people; the cheapening, as far as possible, of the cost of staple commodities to the inhabitants of Puerto Rico; and the stimulation and development of new sources of labor."

Section 2(c): "The Administrator may, from time to time, issue such regulations and orders as he may deem necessary to enforce the provisions of this Act."

Section 3(a): "Whenever in the judgment of the Administrator the price or prices of staple commodities (as these may be determined finally by a public order of the Administrator and for the determination of which the Administrator is hereby authorized) have risen or threaten to rise in a manner inconsistent with the purposes of this Act, the said Administrator may, by regulations or orders, establish such maximum prices or maximum profits as in his judgment are generally fair and equitable and will effectuate the purposes of this Act; . . ."

Section 3(b): "Any regulation or order issued under this Section may be established in such form and manner as to contain such classifications and differentiations, and provide for such adjustments or reasonable exceptions, as may be necessary and proper in the judgment of the Administrator to effectuate the purposes of this Act. . Any regulation or order, issued under this Section, which establishes maximum prices, may provide

or threatens to rise; the price of refined sugar, far from rising or threatening to rise, was constantly decreasing from 1947 to May 17, 1948; consequently, the Administrator lacked power on the latter date to enter the order fixing maximum prices for refined sugar.

It is necessary to determine first on what basis the Administrator acted. Section 12 (a) provides that if a proceeding is filed in the Supplies Appeal Court, the Administrator shall file in that court a transcript of the proceedings, which "shall include a statement, in so far as possible, of the economic data and other facts of which the Administrator

for a maximum price below the price or prices prevailing for the staple commodity involved at the time of the issuance of such regulation or order."

Section 3 (c): "Whenever in the judgment of the Administrator such action should be necessary and proper in order to effectuate the purposes of this Act, he may regulate by regulation or order, and he may prohibit, such speculative or manipulative practices, including practices relating to changes in the form or quality of a commodity, or to the hoarding of any staple commodity, as in his judgment are equivalent or lead to price increases inconsistent with the purposes of this Act."

Section 3 (d): "Whenever the Administrator should determine that the production and possible stocks of staple commodities do not offer guarantees of stability, sufficiency, or reasonable prices in harmony with the needs and the purchasing power of the people, or whenever in any way there should be doubts in the mind of the Administrator as to these matters, or whenever in the judgment of the Administrator such action may be necessary to effectuate the purpose of cheapening the cost of staple commodities which is pursued by this Act, or any other of the purposes hereof, the Administrator shall have power to purchase, store, transport, and dispose of said staple commodities in behalf of the Government of Puerto Rico, without need of calling for public bids, and at such prices as in his judgment will fulfill the purposes of this Act; . . ."

Section 3 (e): "The orders, rules and regulations prescribed hereunder may contain all such provisions as the Administrator may deem necessary in order to prevent the evasion thereof."

Section 9 (a): "The Administrator is authorized to make such surveys or investigations, and to obtain such information, as he may deem necessary and proper to assist him in the establishment of any regulation and order under this Act, or in the administration and enforcement hereof, and of the regulations, orders, and price-schedules adopted hereunder."

The amendments to the foregoing Sections found in Act No. 493, Laws of Puerto Rico, 1946 and Act No. 17 of December 31, 1946, Laws of Puerto Rico, Second and Third Special Sessions, 1946, are not material to this case.

has taken official notice." The Administrator filed such a "Statement" in the lower court, reading in part as follows:

"Prior to and until April 22, 1948, the five refineries of Puerto Rico were uniformly selling refined sugar in Puerto Rico at the wholesale price of $8.00 per hundred-weight, with a 10-day cash discount of 1½ per cent. This price was excessive and onerous for the Puerto Rican consumer, who had to pay the retail price of 9½–10¢ per lb. for refined sugar, packed in bulk, while the consumer in continental United States could buy it at 9¢ a lb., notwithstanding the fact that sugar was an imported product there; and it was likewise onerous for our manufacturers, who could purchase in the continent refined sugar from Puerto Rico at $7.40 or less for one hundred pounds. This gave rise to an anomalous situation as the manufacturers of Puerto Rico could purchase refined sugar in the United States under more advantageous conditions than in Puerto Rico, despite the fact that sugar produced here has to be taken to the continent, where besides original cost additional exportation expenses are incurred.

"These facts having been proven and the Administrator having knowledge of them, and the latter having received complaints from domestic and industrial consumers as well as from dealers, it was the duty of the latter to take steps to cure this evil. In compliance with the statutory provisions, with which he is obliged to comply, and in view of the facts that the refineries of Puerto Rico, appellants herein, were making excessive profits on the sale of sugar for their exclusive benefit, that the producers or *colonos* were deriving no benefits therefrom, and that it was contrary to the public interest and to the purposes of the Supplies Act, the Administrator deemed it desirable and necessary to fix maximum prices for the sale of refined sugar in Puerto Rico."

The Administrator then copies § 1 of Act No. 228, in which the purposes of the Act are set forth, and states that "In order to carry out the purposes of this Act, the Administrator is given ample and discretionary powers, some of which we believe it pertinent to copy here for a better understanding of the case." The "Statement" goes on to transcribe §§ 2 (c), 3 (a) (b) (c) (d) and 9 (a). The Administrator continues as follows:

"In compliance with the purposes of this Act and in the exercise of his discretionary powers and implied obligation, the Administrator thought it necessary to fix maximum prices for the sale of refined sugar, because he found that the prices at which this product was being sold in the local market bore no relation to the prices of the same article in the competitive market; because he considered that those prices implied excessive profits that should be eliminated because they contributed to raising the cost of living, the more so as these profits were not redistributed among the *colonos* and producers in the public interest and the general economy of the island; because he considered that the existing prices demonstrated speculative practices and were wholly contrary to the principal purposes of the Act, which are the cheapening as far as possible of the cost of staple commodities for inhabitants of Puerto Rico and the stimulation and development of new sources of labor.

"It is common knowledge that the Government of Puerto Rico is interested in developing its industries and it is obvious that it is contrary to this purpose and to the development of new sources of labor for a certain group of industrialists, for speculative purposes or in pursuit of excessive profits, to handicap the development of our sources of labor and of subsidiary industries by such means."

The Administrator then quotes § 3 (*a*) once more, and proceeds as follows:

"At the public hearing held on June 23, 1948 the appellants based their contention on the letter of this Section, alleging that sugar had not risen or did not threaten to rise in an inconsistent manner and that on the contrary it had decreased in price and for that reason the Administrator had no power to fix maximum prices in this case for the sale of refined sugar in Puerto Rico.

"We dissent from the view and interpretation of the appellants. We have already set forth the reasons the Administrator had to act and to fix maximum prices and that he based his actions and decisions on the purposes of the Act, but he can not remain silent as to his interpretation of the said Section 3 which he understands ought to be in harmony with the spirit and purposes of the Act itself and not based strictly on its literal meaning.

"The fact that a staple commodity does not rise or threaten to rise in an inconsistent manner does not determine precisely that the Administrator may not take action in fixing the prices of said article if its price, even though it does not rise or threaten to rise, does not have the economic relation it ought to have with other concurrent economic factors, or if, in the judgment of the Administrator, the prevailing price, although it does not rise or threaten to rise in an inconsistent manner, is not reasonable and tends to raise unduly the cost of living and to prevent the development of new industries and new sources of labor; not precisely because it has risen or threatened to rise, but because it has not decreased in relation to the competitive market, to the cost of the raw material or to the cost of elaboration, thereby having a static price, contrary to what it should be, by virtue of an agreement or decision of a manufacturer or a group of manufacturers, or because of speculative practices; or for the purpose of obtaining excessive profits, all of which gives the same negative result as if the price of the article had risen or threatened to rise in an inconsistent manner, the result therefore being contrary to the purposes of the Act, and the latter consequently being of just application. The Administrator, within his discretionary powers, considers that the said Section 3 should be interpreted taking into consideration the spirit of the Act rather than its literal sense and that this construction ought to be in harmony with the purposes of the Act.

". . . . . . . . . .

"We have already said that until April 22 the refineries had been selling sugar at $8.00 per hundred-weight and it is significant, and it ought to be interpreted as complete justification of the Administrator's intervention, that if up to that date the refineries had fixed said price at $8.00 per hundredweight, immediately thereafter, of their own free will and as a consequence of the intervention of the Administrator, they reduced the selling price almost automatically from $8.00 to $7.75." [2]

This lengthy extract from the "Statement" of the Administrator, required by § 12 (a), makes his position clear. It may be summarized as follows: It is true that the only Sec-

---

[2] The remainder of the statement is largely devoted to a detailed account of the data and information on which the Administrator states he based the maximum prices he fixed for refined sugar.

tion which specifically empowers him to fix maximum prices as such is § 3 (a), which provides that he may do so if prices have risen or threaten to rise. But § 3 (a) is not the sole source of his power to fix maximum prices. Section 1 sets forth a number of purposes of the Act, including the elimination of excessive profits. Even in the absence of a finding that prices have risen or threaten to rise, he may fix maximum prices to effectuate these purposes, particularly to eliminate excessive profits, by virtue of the general provisions of §§ 2 (c), 3 (a) (b) (c) (d) (e) and 9 (a).

The difficulty with this theory of the Administrator is that it is not in accord either with the language of Act No. 228 or with the cases. For the Legislature to recite in § 1 the purposes of the Act, including the elimination of excessive profits, is one thing. But that provision *in vacuo* confers no power as such on the Administrator to fix maximum prices or to do anything else. On the contrary, when it comes to determining what powers have been granted to the Administrator, we must look to other Sections of the Act setting up his various powers. And when the Legislature reached the question of fixing maximum prices, it carefully conditioned this power as established in § 3 (a) on a previous finding that prices have risen or threaten to rise.

Nor can it be argued that the Sections other than § 3 (a) relied on by the Administrator grant him the power he claims in this case. Except for § 3 (d) which confers on the Administrator a specific power which is not relevant here, the Sections on which the Administrator relies—§§ 2 (c), 3 (b) (c) (e), 9 (a)—are merely the usual provisions which empower the Administrator to take all incidental action necessary to implement the specific powers provided in other Sections. But to say that they confer unfettered power on the Administrator to fix maximum prices which in his judgment effectuate the purposes of the Act would be to make meaningless the clear and specific terms of § 3 (a) restricting the

exercise of the power to fix maximum prices to cases where prices have risen or threaten to rise. See *De Jesús* v. *Caribbean Trucking Co., ante,* p. 527.

The Sections of Act No. 228 involved in this case, including § 3 (a), were copied almost verbatim from the Federal Emergency Price Control Act of 1942. The cases interpreting the Federal equivalent of § 3 (a) bear out the conclusion we have reached as to the scope of the Administrator's power to fix maximum prices. The Administrator and the Supplies Appeal Court both cite *Philadelphia Coke Co.* v. *Bowles,* 139 F. (2) 349 (Emerg. Ct. of Apps., 1943) and *Seabord Oil Co.* v. *Bowles,* 142 F. (2) 661 (Emerg. Ct. of Apps., 1945) in support of their conclusion that the Administrator is empowered by our Act to fix maximum prices of a commodity even in the absence of a showing that the price of the commodity has risen or threatens to rise. But we think those cases are authority for exactly the opposite result.

In 1942 the Federal Administrator issued a General Maximum Price Regulation under which the prices of commodities generally were frozen at the highest prices charged by vendors during March, 1942. The complainants in the two cases cited above attacked this Regulation as applied to coke gas on the ground that the sales price thereof had not risen and was not threatening to rise. The Emergency Court of Appeals, which had exclusive jurisdiction in such cases, held that the Administrator had the power to issue an overall regulation fixing maximum prices for all commodities upon a finding of a general threat of inflationary increases throughout the economy and without an individual finding in the case of each commodity that its price has risen or threatens to rise. The Court characterized the Federal equivalent of § 3 (a) in 139 F. (2) at p. 352 as "a specific authorization to the Administrator to establish maximum prices by a single regulation *when the prices of commodities generally have risen or threaten to rise to an undue extent.* That Congress con-

templated the exercise of this authority through the imposition of a general overall price ceiling, if it should be found necessary, appears from the legislative history of the act." (Italics ours.)

The Court held in these two cases that to justify an *overall* price regulation, it is not necessary for the Administrator to find that *every* commodity has risen or threatens to rise. Under those circumstances, it is enough to satisfy the requisites of § 3 (a) if the Administrator finds that a general inflationary movement exists in which substantially all commodities have risen or threaten to rise without a finding that the particular commodity sold by the complainant-vendor has risen or threatens to rise. And it pointed out in 139 F. (2) at p. 353 that such a finding had been made in the case before it, since the preamble to the General Maximum Price Regulation stated that "In the judgment of the Price Administrator the prices of commodities and services generally have risen and are threatening further to rise to an extent and in a manner inconsistent with the purposes of the Emergency Price Control Act of 1942."

It is clear from the holding and language of these cases that if the Administrator desires to issue a general maximum price regulation, he cannot do so without making a prior finding that prices generally have risen or threaten to rise. And by the same token, if the Administrator wishes instead as here to fix the maximum price of a single commodity, he must under the specific mandate of § 3 (a) first find that the price of that particular commodity has risen or threatens to rise.

That the two foregoing cases stand for the proposition that the Administrator must look to § 3 (a)—and not to § 1 which states the purposes of the Act—as the source of his power to fix maximum prices, is made crystal clear by *Madison Park Corporation* v. *Bowles*, 140 F. (2) 316 (Emerg. Ct. Apps., 1943). There the court said at pp. 319–20: "This

section [§ 1] deals exclusively with purposes of the Act, making no reference to the manner in which the Price Administrator shall bring about the accomplishment of such purposes. It is in section 2, 50 U.S.C.A. Appendix § 902 [our § 3], that the conditions under which the Administrator shall act are set forth. Subsection 2(a) [our § 3(a) ] deals with commodities and provides that 'whenever in the judgment of the Price Administrator. . . the price or prices of a commodity or commodities have risen or threatened to rise to an extent or in a manner inconsistent with the purposes of the Act, he may. . . establish such maximum price or . . . prices as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act.' " (Matter in brackets ours.)

There is not the slightest intimation in any of the cases that the Federal Administrator was empowered to fix maximum sales prices to effectuate the purposes of the Act as set forth in § 1 without first finding that prices of the commodities involved had risen or threaten to rise. Nor did the Federal Administrator ever claim such power. On the contrary, every Federal price-fixing order which has been called to our attention, including the General Maximum Price Regulation, carefully recited that the Federal Administrator had found that the prices of the commodities involved had risen or threatened to rise. See *Hawaii Brewing Corporation* v. *Bowles*, 148 F. (2) 846, 847 (Emerg. Ct. Apps., 1945) ; *Great Northern Co-Op Ass'n.* v. *Bowles*, 146 F. (2) 269, 272 (Emerg. Ct. Apps., 1944).

Finally, while the question was not raised in *Yakus* v. *United States*, 321 U. S. 414, the Supreme Court did point out that the Administrator is authorized to fix prices of commodities (p. 420) "when, in his judgment, their prices 'have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act.' " See also *Yakus* v. *United States, supra,* p. 420; *Bowles* v. *Willingham*, 321 U. S.

503, 514; Ginsburg, The Emergency Price Control Act of 1942: Basic Authority and Sanctions, 9 Law and Contemporary Problems 22, 26–27; 12 Geo. Wash. L. Rev. 414; 28 Va. L. Rev. 991, 993–94.

As the "Statement" of the Administrator indicates, he did not find that the prices for refined sugar had risen or threaten to rise. Indeed, the unchallenged testimony offered by the refineries was (1) that such prices had steadily decreased since December 31, 1947, when the Federal order fixing the price at $8.20 went out of effect;[3] and (2) that it was selling at $7.75 on May 13, 1948, the date of Administrative Order No. 174. Nevertheless, the Administrator insisted that he was empowered by Act No. 228 to fix maximum prices for refined sugar to serve the purposes recited in § 1 and reiterated in his "Statement". Since § 3 (a) clearly provides and the Federal cases hold that an order fixing the maximum prices of a commodity must be predicated on a showing that the price of the commodity has risen or threatens to rise, Administrative Order No. 175 fixing maximum prices for sales of refined sugar in Puerto Rico was invalid and must be set aside.[4]

This case of course does not involve the validity of orders of the Administrator fixing the maximum prices of *other* commodities where prices had risen or were threatening to rise. Nor are we concerned with the power of the Legislature

---

[3] This testimony was incorrect in one minor detail. Federal price ceilings on sugar terminated on October 31, 1947. 61 Stat. 35; 1947 Annual Survey of American Law, pp. 256, 450.

[4] The Supplies Appeals Court held that the Administrator need not find that prices have risen or threaten to rise as a prerequisite of a price-fixing order. But it also stated that the reduction of the price from $8.00 to $7.75 after the Administrator had indicated he proposed to fix maximum prices for refined sugar showed that prices of refined sugar had risen or threatened to rise. We cannot agree. At the most this demonstrated that the previous price was excessive or that competition had forced the price down, not that it had risen. The statement that a reduction in price constitutes a threat of increase is a *non sequitur*. In any event, as we have seen, the Administrator made no finding of an increase or of a threatened increase and did not base his order fixing maximum prices thereon.

to amend Act No. 228 in order to authorize the Administrator to fix maximum prices to eliminate excessive profits or to effectuate the other purposes set forth in § 1. We hold only that in 1942, in copying the Federal Emergency Price Control Act, our Legislature followed the pattern of the Federal Act and chose in § 3 (a) to confine the power of the Administrator to fix maximum prices for commodities to those cases where prices of the commodities have risen or threaten to rise. While § 3 (a) remains unamended, an order which as in the instant case is not supported by such a showing may not stand.

In view of the result we have reached, it is unnecessary to consider the other errors assigned by the refineries.

For the reasons stated, Administrative Order No. 175 of the General Supplies Administrator fixing the maximum sales prices of refined sugar in Puerto Rico will be reversed.

Mr. Justice Negrón Fernández did not participate herein.